100609-crossroads.txt

1

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE WESTERN DISTRICT OF TEXAS
 2                       AUSTIN DIVISION

 3
    CROSSROADS SYSTEMS, INC.,      § Docket No. 1:08-CV-00861-SS
 4                                 §
    Plaintiff,                     §
 5                                 §
    v.                             § Austin, Texas
 6                                 §
 7   DATADIRECT NETWORKS, INC., and §
     EXCEL/MERIDIAN DATA, INC.,    §
 8                                 §
    Defendants.                    § October 6, 2009
 9

10

11

12                    TRANSCRIPT OF TUTORIAL

13            BEFORE SPECIAL MASTER KARL BAYER

14

15

16

17   APPEARANCES:

18   For the Plaintiff:          Mr. Steven Sprinkle
                                 Ms. Elizabeth Fore
19                               Mr. John Adair
                                 SPRINKLE IP LAW GROUP
20                               1301 W 25th Street
                                 Suite 408
21                               Austin, Texas 78705
                                      *** and ***
22                               Mr. John Guaragna
                                 DLA PIPER, LLP
23                               401 Congress Avenue
                                 Suite 2500
24                               Austin, Texas 78701

25
```

2

```
 1   For the Defendant:          Mr. Robert Becker
                                 MANATT, PHELPS & PHILLIPS, LLP
 2                               1001 Page Mill Road
                                 Building 2
 3                               Palo Alto, CA 94304
                                      *** and ***
 4                               Mr. Steve Pollinger
```

100609-crossroads.txt

```
5                                   McKOOL SMITH
                                    300 W 6th Street
                                    Suite 1700
6                                   Austin, Texas 78701

7
        Court Reporter:             Elizabeth Davis, CSR, RPR
8                                   Deputy Official Court Reporter
                                    P.O. Box 163653
9                                   Austin, Texas 78716-3653

10

11
        (Proceedings recorded by mechanical stenography, transcript
12      produced by computer)

13

14

15

16

17

18

19

20

21

22

23

24

25
                                                                        3
```

```
1                      P R O C E E D I N G S

2                 SPECIAL MASTER:   Everybody want to announce?

3                 MR. SPRINKLE:   Steve Sprinkle on behalf of

4      the plaintiff, Crossroads Systems, Inc., and with me I have

5      Elizabeth Fore and John Adair of Sprinkle IP Law Group, and

6      John Guaragna of DLA Piper.

7                 SPECIAL MASTER:   Okay.  Wait, let me make

8      sure I've got -- is it Fore?

9                 MS. FORE:   Fore, yes.
```

Page 2

100609-crossroads.txt

10          SPECIAL MASTER:   Ford?

11          MS. FORE:   F-O-R-E, E as in Edward.

12          SPECIAL MASTER:   And Mr. Adair, is that

13   right?

14          MR. ADAIR:   Yeah, A-D-A-I-R.

15          SPECIAL MASTER:   Yes, sir?

16          MR. POLLINGER:   Steve Pollinger with McKool

17   Smith on behalf of DataDirect here with lead counsel, Rob

18   Becker from Manatt, who will do the talking today.

19          SPECIAL MASTER:   Okay.

20          MR. BECKER:   Good morning.

21          SPECIAL MASTER:   And we have other guests

22   here?

23          MR. SPRINKLE:   This is Bob Horse, Dr. Robert

24   Horse --

25          SPECIAL MASTER:   Okay.

                                                        4

1           MR. SPRINKLE:   -- with Crossroads.

2           CLERK:   I'm a clerk with Judge Yeakel; I'm

3    just observing.

4           SPECIAL MASTER:   Give my best to Judge

5    Yeakel.   He does these very well, but glad to have a

6    visitor.

7           All right.   Well, I don't know if you-all had

8    talked amongst yourselves and had any sort of agenda; I'm

9    pretty flexible on all of this.

10          The one big rule I will remind everybody is,

11   although we're taking record, it's only -- it'll be sealed.

12   It won't -- you can't use it for briefing, or in any other

13   way, in the trial of the case.   If something goes up to the

14   federal circuit, it's available then, at that point, if

15   there's some issue about this.   But, that's generally the

                             Page 3

100609-crossroads.txt

16    way Judge Sparks likes to do it, so that's why we have

17    Elizabeth here, so.

18                    Yes, sir?

19                    MR. BECKER:  I have a question.  Are we going

20    to be able to keep -- obtain a copy of the transcript for

21    our records?

22                    SPECIAL MASTER:  Certainly.

23                    MR. BECKER:  Thank you.

24                    SPECIAL MASTER:  And it's just -- it's always

25    so tempting to fudge just a little bit.  And I don't fault

                                                                    5

 1    anybody later; it's a Markman hearing and all.  But really,

 2    try to encourage your witnesses to not refer back to -- like

 3    we talked about in the tutorial, and it'll be inadvertently.

 4    Sometimes people will try to cheat pretty flagrantly, and I

 5    know that upsets me as well as the Court, so, let's don't do

 6    that.

 7                    Well, now, I guess, let's start with you;

 8    Mr. Sprinkle, is that right?

 9                    MR. SPRINKLE:  Sprinkle, yes.

10                    SPECIAL MASTER:  And what have you proposed

11    in terms of a procedure for you guys?  And then I'll ask

12    Mr. Becker the same thing.

13                    MR. SPRINKLE:  We have a PowerPoint

14    presentation that we will project --

15                    SPECIAL MASTER:  Okay.

16                    MR. SPRINKLE:  -- so you can see that will go

17    over the technology that is at issue in this case.

18                    SPECIAL MASTER:  Uh-huh.

19                    MR. SPRINKLE:  And I'll talk to that

20    PowerPoint.

                              Page 4

100609-crossroads.txt

21          SPECIAL MASTER:  Okay.  Good.

22               MR. BECKER:  And I haven't seen it, so I plan

23    to essentially react to it; and I have a few slides.

24          SPECIAL MASTER:  Okay.  Okay.  Well, let me

25    just say one thing.  I've worked with Mr. Guaragna many

6

1    times before; we work pretty well together; I think even

2    when I happen to be opposite him, so he's been through this

3    before.  But I can't remember if I've done a claims

4    construction with any of the rest of you-all before.

5               What's most useful for me, today, is really

6    talking about technological issues:  History, context, and

7    trying to read things on to a patent today is not that

8    helpful to me.  As a matter of fact, it starts to aggravate

9    me after awhile, and I know you-all want to try to be

10   helpful.

11              The -- and so, the only thing I'm taking out

12   a little bit there, Mr. Becker, in terms of reacting to

13   it -- if there's technological errors, or things that you

14   think that need to be expanded, that's perfectly okay.  I'm

15   really asking people to sort of set aside the lawyer

16   advocacy today.  Although I like really good lawyer

17   advocacy; I want you to set that aside today and teach me,

18   really, is what I'm hoping you'll do.  Okay?

19              About how long do you think it will take?

20              MR. SPRINKLE:  The presentation will take

21   about 30 minutes if you don't have any questions during it.

22              SPECIAL MASTER:  Oh, that will be unusual.

23              MR. SPRINKLE:  So it will be more than 30

24   minutes.

25              SPECIAL MASTER:  Okay.  And then, Mr. Becker?

7

100609-crossroads.txt

1                    MR. BECKER:  I have about 15 minutes if we

2        don't have questions.

3                    SPECIAL MASTER:  Okay.  Well, so, Judge

4        Austin can have his birthday party in the courtroom today.

5                    MR. SPRINKLE:  I think we'll be cleared out.

6                    SPECIAL MASTER:  Okay.  Good.  Well, take it

7        away then.

8                    So just so you know, I've read the patents

9        and that's about all I've done to prepare.

10                    MR. SPRINKLE:  Okay.  So I have brought, for

11        you, a copy of the two patents and a copy of the

12        presentation.  If I may approach?

13                    SPECIAL MASTER:  Please.  And do you have a

14        copy of the presentation for opposing counsel?

15                    MR. SPRINKLE:  I do, if you would like me to

16        share that with them

17                    SPECIAL MASTER:  Why don't you go ahead and

18        do that right now.  And, again, as far as I'm concerned --

19        well, I'll let you be the custodian of it.  If you want to

20        take it up after the end of the tutorial, that's fine.  If

21        you want to leave him with a copy, that's fine.

22                    MR. SPRINKLE:  I think probably we can just

23        work it out on what we want to do with each other's

24        presentation.

25                    SPECIAL MASTER:  Okay.

                                                              8

1                    MR. SPRINKLE:  Okay.  So being mindful of

2        attempting to use this time as you had intended it, with a

3        tutorial on the technology, we have actually been before you

4        before with these --

5                    SPECIAL MASTER:  Sounded familiar.

**100609-crossroads.txt**

6          MR. SPRINKLE:  -- with the family of patents

7     that are -- two of which are at issue in this -- in this

8     case, before Judge Sparks, now.  And so, much of this

9     tutorial is either content that I believe you may have seen

10    before, or was certainly included in the Markman briefing in

11    the Crossroads v. Dot Hill case.

12          SPECIAL MASTER:  Okay.

13          MR. SPRINKLE:  So some of it is hopefully

14    familiar, hopefully not so familiar that I bore you with it.

15          SPECIAL MASTER:  No.

16          MR. SPRINKLE:  Maybe it'll look familiar.

17    And you know, again, I don't remember, from that case, any

18    admonition that it was too much advocacy, so hopefully it

19    follows along, again, here today, so.

20          SPECIAL MASTER:  Okay.

21          MR. SPRINKLE:  So, if this all works -- it

22    looks like it does.

23          So, just a little bit of context.  As I said,

24    we're going to be talking about technology around the 972

25    patent family.  As a kind of overview statement, this patent

                                                                    9

1     family covers systems and methods that control access

2     between computers and remote storage, okay?  So you need to

3     control access between them.  And you may remember in the

4     Dot Hill case, one of the issues that was -- primary issues

5     in the Markman and the claim construction was, what does it

6     mean to be remote?  Ultimately the interpretation of that

7     was they need to have at least one serial transport; and the

8     parties have agreed to that definition of remote here.

9          So the 972 patent, which was at issue in the

10    Dot Hill case, and is not at issue here, is the parent of

11    the other two patents that are at issue today.  And you'll

                              **Page 7**

100609-crossroads.txt

12    remember that was a -- the claims in that 972 parent are

13    directed towards a fiber channel SCSI system  The 035 case,

14    which is at issue in this -- I'm sorry, the 035 patent,

15    which is at issue in this case, is an any-to-any patent;

16    it's not limited in what the transport mechanisms are

17    between the computers and the storage.  It is, of course,

18    limited by the fact that one of them needs to be a serial

19    transport, but it's not limited to -- needs to be any --

20    directed towards any specific transports.

21              And then the 147 patent is directed towards

22    fiber channel to fiber channel implementations,

23    specifically.  The specifications of these three patents are

24    identical.  The differences between the patents are the

25    claims.

                                                              10

1              So we'll go into a little background here,

2    some of which may be too fundamental, especially since

3    you've seen it before.  But we'll talk a little bit about

4    how storage is accessed and then, generally, how the

5    invention operates.

6              So, this graphic is intended to show that we

7    have -- with computers, you have locally attached storage

8    devices that you can send information to and retrieve

9    information from  So that would be like a device that's

10   just sitting next to your desktop or next to your laptop.

11   And typically, a computer can access that local storage

12   using something called a native low level block protocol.

13   This is a lower-level protocol, and it is in opposition --

14   which we'll talk a little bit about in later slides -- to

15   what you would use if you were connected over a longer

16   transport.

100609-crossroads.txt

17          So, anyway, the local storage is attached --
18    I'm sorry.  Local storage is access using this native low
19    level block protocol rather than a higher level protocol.
20    So, one of the reasons a native low level block protocol is
21    used is it allows fast and efficient access to the locally
22    attached storage.
23          Typically, these native low level block
24    protocols are transported over a SCSI bus.  SCSI is a
25    small -- get it right -- Small Computer Systems Interface.

                                                                11

1    It's a well-known protocol used in, for example, storage
2    transport.
3          SPECIAL MASTER:  And one of my favorite
4    acronyms in all of computer science.
5          MR. SPRINKLE:  I'll use it plenty here today.
6          A SCSI bus is a parallel bus that cannot
7    transport information over great distances; it's typically
8    limited to about 25 meters max, often much shorter than
9    that.  It's a parallel transport as opposed to a serial
10   transport.  Again, that may sound familiar from the previous
11   case.
12          So basically, SCSI buses are incapable of
13   transporting information from a computer to a storage over
14   long distances.  However, in today's storage environments,
15   what you need is the ability to have multiple computers
16   connected to multiple storage devices, remotely, over
17   distance.
18          There's a lot of reasons that you might want
19   to do that:  It centralizes the storage, centralizes the
20   management of the storage, you can place the storage in a
21   remote location, say, off-site, which is -- as it's
22   graphically illustrated here; maybe it's a lower cost area

                              Page 9

100609-crossroads.txt

23    where you can put the storage rather than at people's --
24    expensive floor space where you have people sitting and
25    working.   The physical security of the remote storage is

                                                                    12

1    easier to do than -- potentially than every single
2    workstation and its local storage, et cetera.   But storage
3    connected by a SCSI bus can't meet this need; it doesn't
4    have the capability.
5                    In these modern systems where you want remote
6    storage, you need access controls.   What this graphic is
7    illustrating is that without access controls, the green
8    computer and the blue computer can get access to all of this
9    remote storage, all three of these remote storage devices
10   illustrated in this graphic.
11                   What you want to be able to do is, since
12   there may be data on any of these devices, what I've
13   illustrated here is that on storage device 1 there may be
14   green's personnel files.   On storage device 2 there may be
15   blue's tax records, and you may not want the green to be
16   able to get the blue's tax records, or the blue to be able
17   to get to green's personnel files.   So you just simply
18   create a mechanism so that you prevent that access.
19                   So, now, the storage device on the top is
20   limited to the green computer; blue cannot have access.   And
21   the storage on the left, on the bottom, can't be accessed by
22   the green computer, while at the -- the third storage device
23   listed there is still accessible by both.
24                   Before a Crossroads invention, one of the
25   ways you could establish remote storage was using what's

                                                                    13

1    called a network file server.   And so, this just illustrates

                              Page 10

100609-crossroads.txt

2   the file server having been placed between the computers and

3   the storage, and these transports would be distance

4   transports to allow remote storage.

5                    And, using a network file server you can

6   implement a form of access controls.   So you could control

7   access between the computers on the left and the storage on

8   the right.

9                    However -- and this is a big however -- a

10  network file server creates bottlenecks which slows down the

11  remote access.   I don't know if you have seen this nifty

12  little graphic from our last presentation or not.

13                    SPECIAL MASTER:   You're kind to think I could

14  remember.   Okay, we can drop the facade.

15                    MR. SPRINKLE:   All right.   And, you know,

16  we'll go into a little bit more about how a network file

17  server works, but it does create this bottleneck in the

18  access to the storage process, and there's a -- there's a

19  significant performance degradation.

20                    So what happens when a computer is using a

21  network file server to access remote storage?   What it has

22  to do is, it has to create what we're calling, here, a

23  network protocol request.   And it takes several steps, at

24  the computer, to start that process before it sends it to

25  the server.

                                                                    14


1                    The first thing that happens is that the

2   computer receives the user's request to, in this case, save

3   this file that's named Budget_12; it's going to make a

4   request to write data.   At that point, the computer

5   determines if that file, Budget_12, is on local storage or

6   remote storage.

7                    If it's on remote storage, it builds a

                             Page 11

**100609-crossroads.txt**

8   network protocol -- I'm sorry, yeah, it builds a network

9   protocol, steps that are coming up here.  The first step in

10  that building, that network protocol, is it creates a

11  high-level network request to write this Budget_12

12  information over to the storage.  And the type of network

13  request -- examples of network requests would be CIFS

14  commands or NFS commands.  I'm going to get these wrong,

15  maybe, but NFS is Network File Server command.  CIFS is

16  Common Internet File Systems.  Did I get it right?  These

17  are different file server commands that were created; one

18  was created by Microsoft to be used in a Microsoft OS

19  environment, and the other was created by Sun to be used in

20  a UNIX environment.

21              So, that's the type of request that is being

22  created at the computer in order to go -- go to remote

23  storage, through a server.

24              Computer will then create what's called a TCP

25  layer, a Transmission Control Protocol layer.  This makes

                                                              15

1   sure the data arrived and checks the order of the data, and

2   then creates an IP layer -- you may be familiar with TCPIP

3   as an acronym -- identifies the computer which is making the

4   request, and the remote server to which it's sending the

5   request.  Then creates an ethernet layer so that it can

6   place it onto an ethernet transport and sends the network

7   protocol request over to the server.

8               It also takes time once it gets to the

9   server.  It's a complex process to take this network

10  protocol request that comes in and create a native low level

11  block protocol request so you can access to storage.

12              So, the server receives the information,

                              Page 12

100609-crossroads.txt

13    checks the data accuracy, checks the order of the data,

14    acknowledges the receipt, and if it didn't have it all,

15    requests to say, look, some of the data didn't show up, some

16    of the information didn't show up; resend it.  These are all

17    TCPIP kind of unwrapping steps.

18                    Then, at step eight, it builds the native low

19    level block protocol request, based on the network request,

20    based on that CIFS or NFS request that came over, and this

21    is a very time-consuming step.  This is where a lot of this

22    bottleneck occurs.

23                    It occurs not only on an individual

24    request-by-request basis; it's very complicated to build

25    that request from the CIFS or the NFS command, but also,

                                                                    16

1    lots of computers may be attached to this server, making the

2    same kinds of requests, so the time delay starts to get

3    multiplied as you increase the number of requests.

4                    The server then will use the native low level

5    block protocol to access the storage device.  Server will

6    then build a new network protocol to return an

7    acknowledgment to the computer, send that network protocol

8    request back to the -- back to the computer.  And then the

9    computer will receive the acknowledgment, checks the data

10   was received, and if any of the data wasn't received, it'll

11   resend it.  So really, these arrows go both ways and this

12   clogging up can occur in both directions.

13                    So, given that background, now we take a look

14   at Crossroads' invention.  And what Crossroads' invention

15   does is, this storage router, here in the middle, that's

16   blinking yellow there so you can pick it out, provides

17   access controls between computers and remote storage, and

18   can use native low level block protocols indicated,

**Page 13**

100609-crossroads.txt

19    graphically, by these little -- I guess those are tannish
20    balls floating through to the router.  And what I'll do now
21    is I'll kind of walk through what about the technology
22    allows -- allows this to happen.
23                    What Crossroads' inventions -- one of the
24    things it has is a map, and what this map does is it
25    allocates the remote storage to the computers.  So you can

17

1    see the map floating above the storage router there, being
2    blown out from the storage router.  And what's illustrated
3    there is the green computer has been allocated storage
4    device 1 and storage device 3.  The blue computer has been
5    allocated storage device 3 and storage device 2.  So, in the
6    map, paths have been created between the green computer of
7    storage device 1 and down to storage device 3, and from the
8    blue computer down to storage device 2, and to storage
9    device 3.
10                    Crossroads' invention also provides access
11    controls, uses the map to prevent the green computer from
12    getting access to storage device 2, and the blue computer
13    from getting storage device -- getting access to storage
14    device 1.  And as you can see, as illustrated here, there is
15    no access control of the storage device 3; both computers
16    can have access to that.
17                    There is a variety of mechanisms --
18    implementations that be done in order to allow this access
19    control.  In the -- in the storage industry this will often
20    be referred to as LUN masking, sometimes LUN filtering, even
21    LUN mapping in some instances; there are other names to
22    describe this.  There are a variety of mechanisms that
23    utilize the concept of the mapping implementing a control of

Page 14

100609-crossroads.txt
24    the access.

25                    This is just saying that green can make a
                                                                    18

1    request to the personnel files over on storage device 1;

2    request comes in; green is allowed to have access to that

3    and the request goes through.

4                    Crossroads' invention also provides virtual

5    local storage.  And what that is, is that's the presentation

6    of these remote storage devices as if they were locally

7    attached.  So what happens is, you have this big network

8    where you've got the green computer, the blue computer, the

9    storage router in the middle, all of these storage devices

10   at the back end, and to the green computer, because of what

11   the storage router does, the technology here presenting it

12   out as local -- virtual local storage, it looks like the

13   situation on the right.  To the green computer, it looks

14   like it's got two storage devices that are locally attached,

15   for example, by a SCSI bus.

16                   Similarly, in the case of the blue computer,

17   this big network, which may include a lot of other

18   computers, a lot of other storage devices, this whole

19   network, and this router, looks to the blue computer as if

20   it's got storage device 2 and storage device 3 locally

21   attached.

22                   So, we talked about the invention being able

23   to provide access controls, okay?  We talked about you now

24   have the remote storage with access controls.  By the

25   virtual local storage, what you can now do -- unlike in the
                                                                    19

1    file system situation -- is you can use the native low level

2    block protocol to allow access.  This graphic hopefully

3    represented, as you remove the little water wheel that

**Page 15**

100609-crossroads.txt

4    causes all the trouble and by, you know, allowing access
5    using the native low level block protocol, it makes it a
6    much faster and more efficient access to this remote
7    storage.
8                    So, this is kind of a summary slide.  Again,
9    what we'll do here is say what the blue computer can do.  So
10   the blue computer makes a native low level block protocol
11   request to blue's task files on storage two.  Because blue
12   is mapped to storage device 2, can have access, is allowed
13   access to storage device 2 and the request goes through;
14   green could not make this request.
15                   So I'm going to divert off of these graphical
16   kind of presentations and now look at the patent itself.
17   This is Figure 3 of the patent.  It's an exact
18   representation, except that we've added these colors in:
19   The router is in yellow, and the workstations have each been
20   given a shade of orange.  And so on the left you have the
21   workstations, in the middle, item 56 to the storage router
22   on the right; you see the storage.  Item 60 is a global
23   storage device.  Item 62 is a device that has been
24   partitioned; it has several different partitions of storage
25   within it.  And item 64 is a device that has not been

                                                                20

1    partitioned in this figure.
2                    Pulling out this text from the 035 patent
3    itself, what this description shows -- talks about, is that
4    storage device 60 -- this is the device at the top -- has
5    been configured to provide global data, and can be accessed
6    by all five of the workstations A through E.  Every
7    workstation can have access to the storage device 60.
8                    The next sentence talks about storage device

Page 16

100609-crossroads.txt

9   62 -- that's the longer storage device on the right -- has
10  been partitioned into those four subsets:  Subset 66, 68, 70
11  and 72, and each of those subsets has been allocated to a
12  particular workstation.  Subset 66 -- hopefully the
13  color-coding kind of shows it -- has been allocated to
14  workstation A; likewise 68 has been allocated to workstation
15  B, C -- subset 70 has been allocated to workstation C, and
16  subset 72 has been allocated to workstation D.
17              And, the statement following that is that
18  these subsets can only be accessed by the associated
19  workstations.  The last sentence is that, similarly, storage
20  device 64 has been allocated to workstation E.
21              Okay.  So I'm just going to represent, in a
22  tabular format, what's going on from that description of
23  this figure.  So on the left-hand side of this allocation of
24  storage, you'll see the storage devices, 60, 62, partitioned
25  out into its four partitions in 64, and then across the
                                                            21

1   remainder of the top, you see the workstations A, B, C, D
2   and E.  So, for storage device 60, all five of the
3   workstations can get access.
4               For storage device 62, A, B, C and D can get
5   access to that storage device, but only to the particular
6   partition that's been allocated to them, been mapped to it.
7   For storage device 64, workstation E gets access to that.
8   So what this illustrates is that all of the workstations, A,
9   B, C and D, have access to two storage devices.
10              A, for example, has access to 60 and 62.  The
11  partition 66 is in 62; B, likewise, 60 and 68, on down.
12  E has access to the storage device 60, and storage device
13  64.
14              And that concludes my presentation on the
                            Page 17

100609-crossroads.txt

15    technology.   Do you have any questions?  Would you like to
16    go back through any of that?
17                     SPECIAL MASTER:  No, pretty straight forward.
18                     MR. SPRINKLE:  All right.  How was the
19    advocacy?
20                     SPECIAL MASTER:  You didn't cheat.
21                     MR. SPRINKLE:  No --
22                     SPECIAL MASTER:  Yeah.
23                     MR. BECKER:  Keep it on that last slide, I
24    don't need to use the (i/a).
25                     MR. SPRINKLE:  I'm sorry?
                                                                    22

1                      MR. BECKER:  If you put your presentation
2     back on the last slide then I don't need to hook my computer
3     up; I can just use the last one you were on.
4                      I just have a few comments because I think
5     the technology was accurately represented and I thought it
6     was helpful.
7                      Just a couple of things.  If you look at
8     figure 3 here, what you see on the left-hand side of the
9     storage router is the fiber channel network, and what you
10    see on the right-hand side of the storage router is a SCSI
11    bus.  In this particular embodiment in the patent, the fiber
12    channel is actually running SCSI commands over the fiber
13    channel.  It encapsulates them and then they're taken out of
14    the containers in the storage router, and then sent over to
15    the other side.  That particular technology, using fiber
16    channel to run SCSI commands was well-known, and that's
17    something that will come out later in the case.  But as far
18    as technology terms, it's important to know that that didn't
19    originate with this patent; that that was known.

Page 18

100609-crossroads.txt

20          A couple of other points, I agree with the
21    mapping discussion regarding the storage router, what has
22    been said in the case by -- in prior claims construction,
23    and by the patent examiners, that is it's a one-to-one
24    mapping and the map is resonant at the storage router.  So
25    that one device on one side knows how to talk to its

                                                                    23

1     corresponding part on the other side and vice versa.
2          I think that's it.
3          SPECIAL MASTER:  Wow, this is a record.  Why
4     don't we spend a little bit of time talking about the
5     Markman hearing itself.
6          MR. SPRINKLE:  If you don't mind, I would
7     just like to make you can one comment --
8          SPECIAL MASTER:  Sure.
9          MR. SPRINKLE:  -- to what Mr. Becker said
10    there.
11         So at the risk of pointing out some advocacy
12    that just occurred, it's actually going to be -- the
13    positions in the parties differ on this idea of what it
14    maybe means to be a one-to-one correspondent.
15         SPECIAL MASTER:  Okay.
16         MR. SPRINKLE:  So I just want to point out
17    that, you know, we -- when Mr. Becker said he agrees with
18    what was presented here and that there is a one-to-one
19    correspondence, to the extent there is or isn't that -- to
20    the extent I've made a statement here, I stand by all of
21    those, whether or not that is constitutes a one-to-one
22    correspondents, or a many-to-many correspondents, or a
23    one-to-many correspondents, I think is going to be part of
24    what we're discussing here --
25         SPECIAL MASTER:  Okay.
                         Page 19

100609-crossroads.txt

24

1               MR. SPRINKLE:  -- and I think the patent's
2     pretty clear that -- you know, what it means when it's
3     talking about these correspondents.
4               SPECIAL MASTER:  Okay.  All right.  So, talk
5     to me about what you-all are envisioning then for the
6     Markman hearing itself.  This was quick, and are we
7     anticipating a day, a half a day?  Are we anticipating live
8     witnesses?  Give me your thoughts.
9               MR. SPRINKLE:  Yeah, so we have actually
10    conferred on that ourselves.
11              SPECIAL MASTER:  Okay.
12              MR. SPRINKLE:  So, I think, at this point,
13    it's a little bit green field.  We -- we can probably do a
14    lot of things.  I -- given that we received confirmation,
15    last night, from counsel that some of the terms are going to
16    now be agreed to, I think we've limited, significantly, the
17    number of terms that are at issue as to Markman.  I think
18    we're down to seven -- six, and it was like 13, or something
19    like that.
20              So, we've got a lot fewer terms to actually
21    talk about.  And, quite frankly, I guess -- you know, I'll
22    say this and -- I don't know if Rob disagrees at all -- I
23    think that some of the arguments are going to overlap, even
24    between those terms, and so I don't expect it's necessarily
25    going to be an all day thing, so.

25

1               SPECIAL MASTER:  And what about witnesses?
2     Are you anticipating any live witnesses?
3               MR. SPRINKLE:  Maybe.
4               SPECIAL MASTER:  Okay.

Page 20

100609-crossroads.txt

5                    MR. SPRINKLE:  I guess is the best I can

6    answer that right at this moment.

7                    SPECIAL MASTER:  Fair enough.  Do you have

8    thoughts on that?

9                    MR. BECKER:  I agree.  I can't imagine the

10   Markman hearing going more than half a day --

11                   SPECIAL MASTER:  Yeah.

12                   MR. BECKER:  -- because I don't have that

13   many --

14                   SPECIAL MASTER:  Oh, you don't?  Well, we've

15   had multi days before.

16                   MR. BECKER:  Well, it's possible, but I don't

17   see it in this case.

18                   SPECIAL MASTER:  Yeah.

19                   MR. BECKER:  And I agree, it's possible that

20   we would have a witness; I would have to meet to confer

21   about that, but at this point I don't think so.

22                   SPECIAL MASTER:  Okay.  Well, let's talk

23   about making this convenient, then, for people coming in

24   from out of town.  We have the courtroom for the whole day,

25   but that doesn't necessarily mean we have to start -- I

                                                                26

1    mean, if it saves people from having to come in the night

2    before, I don't mind starting later, if that helps folks.

3                    MR. BECKER:  Just to be safe, I would come in

4    the day before.  I don't think there's any way around that,

5    but I appreciate that.

6                    SPECIAL MASTER:  Okay.

7                    MR. SPRINKLE:  Well, it might actually be

8    more convenient if we start in the morning so you can catch

9    a plane out.

10                   MR. BECKER:  That's true.

100609-crossroads.txt

11              SPECIAL MASTER:   Okay.

12              MR. BECKER:   Um, (i/a).

13              THE REPORTER:   I'm having a hard time

14   understanding you.

15              MR. BECKER:   I'm sorry.   The typical

16   9:00 a.m. is fine, I would imagine.

17              SPECIAL MASTER:   The one thing I know the

18   Court has gotten -- has been more concerned about in the

19   last couple of years really, is making it very clear who one

20   of ordinary skill in the art is, and so you-all be sure and

21   address that.   And if there's a fuss about that, know that

22   that's not some trivial fuss to Judge Sparks anymore; it's

23   kind of gotten to be a big deal.

24              The -- ultimately what he likes me to submit

25   to him is simply a big chart, and to the extent that you-all

                                                                    27

1   can work and make it into one, that's fine.

2              The keys to the kingdom in my office is a

3   woman named Allison Chalkey; everybody needs to make

4   Ms. Chalkey happy, and she will try to merge documents that

5   you-all -- if you-all are -- or prefer to submit separate

6   documents, that's fine; do it in Word, WordPerfect; it

7   doesn't matter.   If, on the other hand, it's a joint thing,

8   a PDF is just fine.   If we don't have to edit anything; it

9   doesn't matter.

10              The chart, basically, will have the -- the

11   claim, the phrase, the word in context, a slight context on

12   either side of it, within the claim   Then another column

13   will be the proposed -- the plaintiff's proposed

14   construction, then next to that is just a real quick summary

15   of the evidence, both -- he likes it sorted by intrinsic and

                        Page 22

100609-crossroads.txt
16    extrinsic evidence.  This is not a repeat of everything
17    you're doing in your brief, a simple page and line cite in a
18    deposition, an exhibit number with a page within that
19    exhibit, those kind of things, just a quick outline form
20    And then there will be a column for the defendant's, a
21    column for the defendant's evidence, and then a column for
22    my recommendation; that's the format he likes to see.
23              And we've done several of them, if -- I'm
24    sure you guys, I know, have done some, so if you need to see
25    the format or if you want to talk to Ms. Chalkey about it,

                                                                    28

1    that's fine.
2              MR. BECKER:  Is this something that you would
3    like us to try to file before the hearing?
4              SPECIAL MASTER:  No, this will -- this is at
5    the tail end of everything.  Let's talk a little bit about
6    that -- actually, you don't need to take all of this down.
7              (Adjourned)
8
9
10
11
12
13
14
15
16
17
18
19
20
21

100609-crossroads.txt

```
22
23
24
25
                                                              29
```

```
 1                      * * * * * *
 2
 3
 4
 5   UNITED STATES DISTRICT COURT )
 6   WESTERN DISTRICT OF TRAVIS   )
 7
 8
 9        I, ELIZABETH DAVIS, Deputy Official Court Reporter,
10   United States District Court, Western District of Texas, do
11   certify that the foregoing is a correct transcript from the
12   record of proceedings in the above-entitled matter.
13        I certify that the transcript fees and format comply
14   with those prescribed by the Court and Judicial Conference
15   of the United States.
16        WITNESS MY OFFICIAL HAND this the 5th day of November,
17   2009.
18
19                            /s/_____
                              ELIZABETH DAVIS, RPR, CSR
20                            Deputy Official Court Reporter
                              United States District Court
21                            Austin Division
                              200 W 8th Street
22                            Austin, Texas 78701
                              (512) 656-2058
23                            Certification No. 2351
                              Expiration:  12/31/2010
24
25
```

Page 24